Good afternoon, your honors. May it please the court, my name is Howard Davis and I represent the petitioners Henry Nababan and Harlena Rose Sielalahi. And I'd like to reserve about two minutes for rebuttal. We asked the court to find that the Board of Immigration Appeals abused its discretion in denying the petitioner's motion to reopen and grant the petition for review. And just wanted to point out the extent of the board's analysis in which it compared country conditions as it existed in 2009 at the time of the petitioner's original hearing and when they filed in 2018. And this is what they said, the Indonesian government respected religious freedom and Protestantism received official recognition. Nonetheless, the Indonesian government sometimes failed to protect persons from discrimination and abuse based on religion, including instances of violence, attacks on Christians, and church closures. And it noted back in 2009 that Christian Indonesians were determined to be members of a disfavored group. Now in terms of what they had to say, what the board had to say about 2018, and they said it said that a comparison of the conditions shows, at least the new information, that Christians are still a disfavored group. And they were mentioning that they haven't, that the petitioners didn't show how they were similarly situated to a hoke and that the evidence does not reflect materially changed conditions affecting their individual risks. And I would argue that this superficial type of comparison is based on the fact that things appear to rhyme. But this type of denial or not finding of changed conditions based on this kind of rhyming is something that this court has rejected. In Malta, the court recognized that there's always, there's usually going to be some sort of relationship between the original case and the new information. The only question is for prima facie showing whether circumstances have changed sufficiently such that a petitioner who previously didn't have a legitimate asylum claim now does. And then in Salim, the Salim court said that a continuation of the same type of violence may constitute changed conditions where the violence has intensified and increased. And so what was submitted with the documents here, including the affidavits of two expert witnesses, is that things have significantly changed. And particularly after 2016, but Dr. Winters and his affidavit mentioned beginning with late 2012-2013. The evidence that the petitioner submitted is basically the same type of evidence that we see in a number of cases in Salim, in Siotong, in Siotong in which the court even mentioned Dr. Winters' affidavit. And in Liem, which I submitted as part of the 28-J letter, so Liem and Tanu Santoso, Chris Nowatti, these are all, and in addition, I submitted some, in a 28-J letter, some unpublished BIA cases, including two signed off by the board member who denied the petitioner's motion. And in that one, in one of them, he even had before him an affidavit of Dr. Jeffrey Winters. And basically what he said is that although religious extremism, violence, and discrimination also existed at the time of the applicant's 2005 hearing, the applicant has shown material changed circumstances for Christians in Indonesia. So the question is, I mean, this is basically the same thing, and yet the board came out with a different result. Mr. Davis, can I, I got a few questions for you. Yeah. And I want to make sure I understand your, the case here and the basis for your motion to reopen. Yeah. So I get the point you just made, that for Christians, the, you assert that the evidence you presented in connection to this motion, the second motion to reopen, is materially different than what was presented at the original removal hearing. And I don't want to get into the details of that, but there was one thing that caught my eye with respect to the declarations that were filed by your clients and Winters' declaration. And that's this. It seems to be the case that his focus is on evangelical Christians. Yes. And the Seventh-day Adventists, the tenant of proselytizing, and he seems to focus on, and their declaration is pretty clear, that if they were to go back, they would continue their proselytizing activities. That for Christians who are involved in evangelical work or beliefs, that for them, conditions have materially changed. Is that, is that what your, is that what your focus is, or is it just that for Christians, conditions have generally changed? I think that what, I think it's both. I think that, I mean, in the cases I noted, and both in Dr. Winters' affidavit and Dr. Kamak's and everything we submitted, they did talk about the change with regard to Christians. But it was also pointed out that, and this is something that Dr. Winters pointed out on, is that particularly evangelicals who go out and proselytize, and so they… Well, see, what caught my eye when I read his declarations, what he says is that evangelical Christians… Your Honor, I'm sorry to interrupt, but what page are you referring to? Page 178 of the excerpts of record. It's page 3 of his declaration. Okay. He says, but, and, but, and evangelical Christians face heightened risks because a core part of their faith and practice is to go out into their communities and spread the gospel. Yes. Which in Indonesia is deemed to be predatory proselytizing that leads to religious conversion. Right. Believers. Correct. Correct. Although, and, you know, but he, of course, he's talking about the spike in problems that have come about over the years. And particularly, you know, he mentioned with the whole targeting of Ahok and how that really brought, how that was, improved the position of Muslim conservatives in having power. And, but in this, this, this environment of heightened animosity and violence, they, evangelical Christians, face a particularly dire situation. And, you know, as part of the record, there's a letter from Ms. Silalahi's father, Brandon Silalahi, who had problems precisely because he did that, did that. And that actually is a tie into individual, a showing of individualized risk in the, in the context of the changed country conditions. I don't know if that answers your question. I'm just, I'm just curious about what you make of, you know, what you made of Dr. Winter's affidavit, because he seems to, as I read it, and he talks about conditions with respect to Christians in general, but when he focuses on petitioners, he focuses on the fact that they're, part of their religious tenet is proselytizing. Right. Evangelicals, and that they're open in their practice, and that's what puts them at risk. Right. And that's my concern for my own. When I read the board's decision, I'm not, I have some doubts about whether or not they adequately considered that particular circumstance in evaluating all of the record evidence that was submitted in support of the motion to reopen. And that's the point. I haven't reached any firm conclusions. Right. That's what, that's what struck me about all of this material. Right. And that's what, that was my problem with the case, and I, that was the, the emphasis in my argument, and in citing two cases like Sietang and others, in which the board just did not consider them. So that's. Sietang's a little bit different, because they're, they don't even mention anything about proselytizing or anything, but they do raise, they raise the issue, and it's interesting. I found that case to be very interesting, and the Third Circuit's opinion to be very interesting in this context. Right. And it's just that here, this was very, very superficial. It does not indicate that they really gave due consideration. I just want to say. Why don't we hear from the government? I'll give you a minute for review. Yeah. I'm sorry. Okay. Thank you. Oh, let me. Good afternoon, Your Honors. Good afternoon, Your Honors. May it please the Court. Remi Daryachal Thodir, representing the Attorney General of the United States. I'd first of all like to point, to address the issue of the board's position, which, the government's position is that the board addressed the issue of evangelical Christians in Indonesia. In the second, in the first full paragraph of the board's decision on the second page, the board mentioned specifically that petitioners have stated that they are suffering the adventists, and part of the tenet is to spread the gospel, and also that a male petitioner recently had been elected an elder, and that based on that, they have an individualized risk of harm in Indonesia. That is on page four of the administrative record, and it's the first full paragraph where the board details the specific claims of petitioners, and on that basis, made its decision. Did the advocate account for Dr. Winters' opinion? Yes, the board did. The board specifically stated, mentioned that opinion in the third full, third paragraph on page four of the administrative record. It mentioned exhibits, Dr. Winters' affidavit is Exhibit U, and the board mentioned, specifically mentioned that. The evidence includes statements prepared specifically for this motion by Jeffrey Winters and Mark Carmack. And so the board listed all those, and stated that it had considered the evidence, because it specifically listed those exhibits as part of its consideration. Part of the problem here is that apart from the exhibits from Dr. Winters and Mark Carmack, there is nothing in the record, as the board said, that specifically points to an individualized risk of harm by petitioners based on their evangelism in Indonesia. What about, counsel, the letter from the petitioner's father? Yes, the letter from the petitioner's father is actually very interesting, because that letter did not mention the evangelizing work. It basically was a private Bible study with a member of staff in a very remote location on his farm, 15 hours away from where petitioners actually lived. And petitioner's father, petitioners have not stated that any other such thing has occurred. And petitioner's father remains, continues to serve as a high-profile position as the director of family personal ministry at the SCA church in the town where he resides. So he has not stated, the father did not state that he sought to solidify or that he has been harmed since that isolated attack on his plantation in March 2017. So that is a totally different situation from what petitioners are advocating. I'd also like to bring to the court's attention a very crucial and important issue here. First of all, the board did not overlook any evidence whatsoever, which is the case in Lim and all these other cases. The board considered the most important question here, which is whether or not petitioner's evidence supported the conclusion that the situation in Indonesia is adequately different from the time of petitioner's 2009 hearing to demonstrate changed country conditions. And the board determined that the evidence failed to do so. And when we look at what petitioners presented in their motion to reopen as examples of worsening conditions in Indonesia, we see parallels in the incidents decided in support of their request for relief at their 2009 hearing. First of all, the female petitioner testified in 2009 that she was always terrified to practice her faith in Indonesia. She specifically stated that she was prevented from spreading the word of gospel to other people. And that's on page 576 to 77 of the administrative record. So the fact that there are deaconesses now in the church or hold a higher authority in the church really makes no difference. It's the same claim that is being litigated, which is the difference between this case and all these other cases. Also, can I just take you, I want to go back to the decision for just one minute. I know you want to make a few points, and I'll let you do that. But thank you. You pointed out at the beginning of the decision the reference to their membership in the Seventh-day Adventist faith and particularized risk and whatnot. But if you look at their, kind of when they sum up their situation or their analysis on page 5 of the excerpts of record or page 3 of the decision, they say, the board wrote, a comparison of the evidence of conditions at the time of the respondent's removal hearing. And the evidence offered with this motion reveals that Christians in Indonesia continue to be a disfavored group. Yes, Your Honor. As I understand their concern, it's that they are evangelical Christians. And I understand that, Your Honor. But evangelical Christians are Christians, and petitioners failed to provide specific evidence. Some Christians keep their religion private, their beliefs private. It's a personal thing. Others, it's part of the faith to proselytize and to bring their religion to other people. And that's what, see, that's what Dr. Winters seems to say causes, puts these individuals at a higher risk. And my concern is I don't think the board actually completely grappled with that. You know, I don't know. I haven't reached any conclusions about this case. I'm just trying to understand it. But the other thing about this case that bothered me a little bit was, you know, these are, there's three United States children, citizen children. These people have been in the country for a long time, and they're good people. You know, they're people of faith. Yes, Your Honor, but the immigration laws have specific rules. I understand that. Hundreds of immigration cases have participated in many decisions removing many people from this country. But has there been any attempt, we had one of the judges yesterday raise this question with the government counsel. Has there been any attempt to consider, you know, some sort of alternatives to removal? Your Honor, yes. Under the previous administration, there was no leeway whatsoever. There was no prosecutorial discretion. There was nothing we could do. Under the present dispensation, the administration is looking at it. We don't have any answers yet. But for now, this is where we are, Your Honor. And based on the immigration laws, the board's decision was correctly decided. Petitioner may file another motion to reopen the board and see what the board, you know, says. But based on the record as it is, petitioners did not submit any evidence other than the affidavits of the experts discussing the treatment of evangelical Christians in Indonesia. And that's very, very crucial. And I think perhaps what the board was getting on is because Mr. Navaban, that is the male petitioner, testified at the 2009 hearing that he was a deacon at that time. So nothing has changed for petitioners. And as I read earlier to you the testimony of the female petitioner, she said that she was proselytized in Indonesia and she was not allowed to be. So nothing has changed. Can I ask a question? Yes, Your Honor. Which is, as I understand, the petitioners here overstayed their visa back in 2003, maybe. Is that right? And they got an NTA way back then. So it's almost two decades we're looking at. And it's right. They had three, you know, they've had three kids in that time. Why in the world? And they've been, they had an appeal up to the Ninth Circuit and lost. And then they moved to reopen and have another appeal up to the Ninth Circuit and lost. And so why, what is the reason that they're still in the United States? Well, that is for the Department of Homeland Security to answer, Your Honor. We have the Department of Justice, so we're not the enforcement. Do you know why they are or do you not know why? I don't know why, Your Honor. I can ask your opposing, I can ask opposing counsel. Because they're not an enforcement priority. They were not because they have no criminal record, as you rightly said. They're good people. It's a sympathetic case, but it is what it is. The law is what the law is. And unfortunately, under the previous administration, there was just no way out. No prosecutorial discretion. Maybe under this administration, it could be something that could be considered, but it's a very new dispensation. And so we don't know what can be done for that. So if I may wrap up, Your Honor, may I? Sure, go ahead. Just to say that. So petitioners, if you look at pages 822, 825, and 826 of the administrative record, the news articles from that time from petitioners' previous hearing reported attacks on evangelical Christians and the sentencing of 41 Christians by an Indonesian court to a five-year term of imprisonment for blasphemy. So this was ongoing. So the board got it right. The board looked at the record and said there was no change based on what was happening at the initial hearing. Again, this case is a sympathetic case, but if you look at the decisions of this court, Your Honor, in the last couple of years, the court has issued at least seven decisions, including one three weeks ago, declining to find changed country conditions in Indonesia under circumstances similar to petitions. We have those cases here. Although they're unpublished, they are certainly persuasive. As to the board decisions that petitioner attached to the 28-J letter, every case has a different record and a different analysis based on the specific nuances of the cases. As we said in our response, those cases are just not persuasive. They have no precedential value here. So this case is totally different, Your Honor, because there is no indication of changed circumstances, and petitioners did not submit anything indicating changed circumstances for evangelicals. As you heard from counsel, they're not even sure what it is. They're saying it's for Christians. They're saying, oh, it's for evangelical Christians. Even petitioners don't really know where they stand in this matter in terms of what their case is about. Thank you, counsel. Thank you very much, Your Honor. We have a little bit of rebuttal time. Mr. Davis, can you... I am curious as to... Can you tell me what has happened in the 20 years? We have multiple decisions where they've lost, both on the merits and in their motions to reopen. So I'm trying to figure out why... Enlighten me as to why people end up just staying here so maybe 10 years from now we get another motion to reopen. I'm trying to figure this out. Well... I mean, I have to say that it's probably not too radically different than what opposing counsel mentioned, is that it ultimately has to do... That's up to Department of Homeland Security. It has to do with... So specifically what happened after the last decision, Mr. Davis, after the last decision, which was in 2013 or in the year... Yeah, 2013. So then that's seven years. Is it just that the agency didn't execute the... They could have removed them, but they just didn't? Is that what... They didn't. I mean, there's... It gets down to an economy of resources and the government focuses on priorities, as was noted. They don't have a criminal record. They've been involved in the community, have citizen children. They didn't come in that respect to the attention of Homeland Security. So a related question then, assuming we vote against you on this and upheld or denied the petition, I guess the agency may or may not actually execute the order removal at their discretion? It's a new administration. Yeah, but my point is they don't have to execute it. May or may not, Your Honor. Okay, they don't have to. I mean, it gets down to priorities and resources, and I really don't know what to say. None of us know, it sounds like. Can I ask you a different question? Are you aware of any Christian... I know there's a lot of different Christian sects, but are you aware of any Christian sect that doesn't believe in proselytizing? Okay. I think that the issue is the way that one goes about being a witness to one's faith. I mean, it's about witnessing, and I'm not an expert on religion or on the different forms of Christianity, but I'll just say from my experience, there are different ways of witnessing, witnessing the message of Jesus Christ. It could be through evangelizing, active evangelizing in others. It's individual conversations or just telling about their experience. But in terms of an active point, it's right. From my understanding, evangelicals tend to be more aggressive, and I'm not using that as a negative word. I'm just saying more out there in doing that than other groups, and that's about the best I can answer you on that, Your Honor. But it sounds like, I mean, Catholics, I don't think most people think of Catholics as evangelicals, but I think Catholics proselytize, correct? But the thing is, is that, again, the extent to which you're out there doing it. In fact, one of the cases, and I can't remember which one, involved a Catholic, you know, Indonesian. But, yeah, I mean, but I can't say that everybody is the same. I think that's probably right, but I'm just trying to think of like, you know, I realize that later— You're trying to do some blind drawing here, I guess. Yeah, I'm just trying to think of, I'm not sure if I'm aware of anybody under the frig umbrella of Christians, that actually, I realize there's a group called evangelicals, but— I think that Professor Winters, you know, did indicate that, you know, that the evangelicals are more out there, and their active proselytizing is part of their religious expression. So he did, in that sense, make a distinction. That sounds like a—I have a bachelor's in theology, and that doesn't seem consistent with my understanding of how the different Christian sects— It seems to me like Catholics would have a very, you know— Whether they do or not, I don't know, but as far as, like, as a matter of doctrine, whether they actually are out there supposed to be evangelicals. But, you know, I guess we'll take it for what it's worth. So I just wanted to say, you know, I just want to say one other thing, is that, you know, the petitioners know what this case is about, as—unlike that was suggested by government counsel— is that, again, that things in general have gotten worse for Christians, and as pointed out by the experts, and the petitioners, because they are evangelicals, are particularly vulnerable in that respect. And I think that, as was pointed out, the board did not really meaningfully grasp or address the particulars of this case. And in the end, I mean, merely listing information in an earlier part is not the same thing as grappling with it in a really conclusory type of reasoning. And the petitioners are left with a hobson's choice. If they go out and practice and evangelize, then they have a problem. If they don't do it, then they're not practicing their religion, which is also a form of persecution. And just one thing about the father's letter. The thing is, is that he was engaged in an act of proselytizing. I mean, that's how it takes place. It's not only someone who stands on a corner and gives a—and preaches. It's involved—it involves individual acts. And this is what happened here. And there is no indication that he actually continued. And this guy's a 73-year-old man, and he's probably not going to do too much more to engage himself. Anyway. Okay. You're over your time, and we thank you both for your arguments in this case this morning. This afternoon. I'm sorry. This afternoon. And with that, we will submit the case for decision. Thank you very much. Thank you. Thank you, Your Honor. Thank you.
judges: Paez, Gleason, Vandyke